```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

TOTAL E&P USA, INC.              *          CIVIL ACTION

VERSUS                           *          NO: 09-6644 C/W 10-0106

KERR-MCGEE OIL & GAS             *          SECTION: "D"(3)
CORPORATION, ET AL
```

## ORDER AND REASONS

Before the court are the following motions:

(1) **Motion for Summary Judgment** (Doc. No. 76) filed by Total E&P USA, Inc. (Total); and

(2) **Motion for Summary Judgment** (Doc. No. 139) filed by Statoil Gulf of Mexico, LLC. (Statoil).

Memoranda in opposition were filed by Kerr-McGee Oil & Gas Corporation and the "Individual Claimants" (Lynn S. Belcher, C. Dan Bump, Cathy A. Zeornes Guy, Gary H. Hummel, Allan D. Keel, Kevin A. Small and Waynes G. Zeornes). The motions, set for hearing on Wednesday, November 3, 2010, are before the court on briefs, without oral argument. Now, having considered the memoranda of counsel, the record, and the applicable law, the court finds that the motions should be granted.

Under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§1301-356a, the federal government's Minerals Management Service (MMS) (now called the Bureau of Ocean Energy Management, Regulation and Enforcement), is authorized to grant oil and gas leases covering blocks on the outer continental shelf.  OCSLA, §8, 43 U.S.C. §1337; 30 C.F.R. Pts. 256-60.

For deepwater leases sold in a specific region in the Gulf of Mexico between 1996 and 2000, Section 304 of the Outer Shelf Deep Water Royalty Relief Act (DWRRA) provides:

> For all tracts located in water depths of 200 meters or greater in the Western and Central Planning Area of the Gulf of Mexico, including that portion of the Eastern Planning Area of the Gulf of Mexico encompassing whole lease blocks lying west of 87 degrees, 30 minutes West longitude, any lease sale within five years of the date of enactment of this title, shall use the bidding system authorized in section 8(a)(1)(H) of the Outer Continental Shelf Lands Act, as amended by this title, except that the suspension of royalties shall be set at a volume of not less than the following:
>
> (1)   17.5 million barrels of oil equivalent for leases in water depths of 200 to 400 meters;
>
> (2)   52.5 million barrels of oil equivalent for leases in 400 to 800 meters of water; and
>
> (3)   **87.5 million barrels of oil equivalent for leases in water depths greater than 800 meters.**

Pub.L. No. 104-58, 109 Stat. 557, 563 (1995) (uncodified, but present in a note to 43 U.S.C. §1337)(emphasis added); *Kerr-McGee Oil & Gas Corp. v. United States Dep't of Interior*, 554 F.3d 1082, 1083-85, (5th Cir. 2009).

In 1998, the MMS granted to Mariner Energy, Inc. (Mariner) and Westport Oil and Gas Company, Inc. (Westport) a **§304 Lease**, covering a block located on the OCS offshore Louisiana in water depths greater than 800 meters, entirely within the Central Planning Region and entirely west of 87°30'W longitude. (*See* Total's Ex. 1, MMS Lease Award Notice; and Total's Ex. 2, Lease). Mariner and Westport each had a 50% interest in the Lease. (Total's Ex. 2, Lease).

The Lease provides in bold print:

> **This lease may be eligible for royalty suspension pursuant to PL 104-58. If eligible, Sections 5 and 6 of this lease instrument will be suspended by 30 CFR Part 26, published in the <u>Federal Register</u> on January 16, 1998 (63 FR 2626).**

(*Id.* at p. 1, n. 1).

Section 5 of the Lease deals with minimum royalty, and Section 6 governs the manner in which the landowner's royalty is calculated and paid. (*Id.* at p. 2).

By an **Assignment of Overriding Royalty Interest** in 1999, Westport granted Westport Overriding Royalty LLC and six named

3

individuals (Lynn S. Belcher, C. Dan Bump, Gary H. Hummel, Allan D. Keel, Kevin A. Small and Waynes G. Zeornes, who are six of the Individual Claimants in this matter),[1] certain overriding royalty interests "payable out of all oil, gas, casinghead gas and associated substances produced, saved and marketed from the ... 'Lease' ..., subject to any applicable pooling, unitization or similar agreement, statute or order...." (Total's Ex. 3, First Assignment).[2]

This assignment also provided in part:

> **1.   The overriding royalty interest assigned herein shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease.**

*(Id.* at ¶1, emphasis added). The court will refer to this provision as a "Ca1culate and Pay" provision.[3]

And the assignment was also subject to the following terms and

---

[1] These individuals were employed by Westport and made up Westport's "exploration team" for the subject GC 640 Lease. (Individual Claimants' Opp. Memo., Doc. No. 159, p. 2 and 4 of 32; Ex. 1, Wolf Affidavit at ¶12 and Exs. 3-8, Affidavits of Belcher, Bump, Hummel, Keel, Small and Zeornes). Westport compensated its land and geoscience personnel with salary and the opportunity to earn overriding royalty interests in prospects they helped develop. (Wolf Affidavit at ¶13).

Individual Claimant, Cathy Zeornes Guy, was not an employee of Westport, and she acquired her overriding royalty interest from her ex-husband, Wayne Zeornes, as part of their divorce settlement. (Zeornes Affidavit at ¶9).

[2] Kerr-McGee refers to the quoted language as "the granting clause." (Kerr-McGee's Opp., Doc. No. 148, p. 20 of 30).

[3] Kerr-McGee refers to this provision as a "Calculate and Pay as Lessor" clause; Total refers to this clause as a "same as fed" clause, and Statoil refers to it as a "same-as-lessor" provision.

conditions:

> . . .
>
> 2.  If Assignor owns less than all the working interest in the Lease, or if the Lease covers less than the entire oil and gas mineral estate in any of the lands described therein, the above described overriding royalty shall be reduced proportionately.
>
> 3.  The overriding royalty interest herein conveyed is payable out of and only out of oil and gas produced, saved and marketed, pursuant to the terms and provisions of the **Lease, and is expressly subject thereto**.
>
> 4.  The overriding royalty interests herein conveyed shall not, in any event, be paid or accrued upon any oil, gas, casinghead gas and other hydrocarbon substances used for operation, development or production purposes or unavoidably lost; and no overriding royalty shall be paid upon gas used in repressuring or recycling operations or pressure maintenance operations.
>
> . . .

(*Id.*, emphasis added).

By **Assignment of Record Title in Oil and Gas Lease**[4] from 2001, Westport Oil and Gas Company, Inc. assigned all of its interest in the Lease to Chevron U.S.A. Inc., but reserved unto itself "an additional overriding royalty interest equal to seven percent (7%)

---

[4] Kerr-McGee and the Individual Claimants characterizes this second assignment as a sublease, since Westport reserved an override from the interest transferred to Chevron. (Kerr-McGee Opp., Doc. No. 148, page 8 of 30, n. 4 & Individual Claimants' Opp., Doc. No. 159, p. 6 of 32).

of 8/8ths, proportionately reduced to the extent Assignor owns less than all of the working interest in the Lease, of oil and gas production saved, removed, or sold from the Lease herein assigned." (Total's Ex. 5, Second Assignment).[5]

This second assignment (like the first assignment) provided in part:

> **The overriding royalties described herein shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease.**

(*Id.*, emphasis added). The court will also refer to this provision as a "Calculate and Pay" provision.[6]

Westport and Westport Overriding Royalty LLC ultimately conveyed their overriding royalty interests to Kerr-McGee. It is undisputed that the overriding royalties now burdening the Lease total 4.0% and are claimed as follows:

| | |
|---|---|
| Kerr-McGee Oil & Gas Corporation | 3.73750% |
| Lynn S. Belcher | 0.03125% |
| C. Dan Bump | 0.01250% |
| Cathy A. Zeornes Guy | 0.03125% |
| Gary A. Hummel | 0.06250% |

---

[5]  Kerr-McGee refers to the quoted language as "the granting clause." (*Id.* at p. 20 of 20).

[6]  *See* fn. 3, *supra.*

| | |
|---|---|
| Allan D. Keel | 0.03125% |
| Kevin A. Small | 0.06250% |
| Wayne G. Zeornes | <u>0.03125%</u> |
| TOTAL | 4.00000% |

Through a series of mergers and acquisitions, Chevron acquired Mariner's 50% interest in the subject Lease, vesting Chevron with 100% of the working interest in the Lease, subject to the collective 4.0% overriding royalty interests owned by Kerr-McGee and the individual Claimants. In 2002, Chevron assigned a 25% working interest in the Lease to Encana Gulf of Mexico LLC, and in 2005, Encana assigned its 25% working interest to Statoil. (Statoil Ex. 11).

In 2002, Chevron also assigned a 17% interest in the Lease to Shell Gulf of Mexico Inc. (Total's Ex. 7). In 2006, Shell assigned this same 17% interest in the Lease to Total. (Total's Ex. 14).

It is undisputed that the agreements through which Statoil and Total acquired their working interests in the subject Lease were made subject to the overrides created by the 1999 Assignment ("First Assignment") and 2001 Assignment/Sublease ("Second Assignment").

Through February 2010, the cumulative production allocated to the Lease has been less than 35 million barrels of oil equivalent. (Total's Exs. 19-20). Total calculates that "[a]t this average

rate, cumulative production allocated to the Lease should reach the '87.5 million barrels of oil equivalent' threshold sometime in the latter half of 2011." (Total's Memo., Doc. No. 76-3, at p. 6, n. 14). Because the Lease has not yet reached the §304 threshold of 87.5 million barrels of oil equivalent, both Total and Statoil have not yet calculated and paid any royalties to the federal government under the Lease.

Total has also not paid Kerr-McGee any overriding royalty payment. However, Total initially paid a total of $54,452.52 of overriding royalties to the six individual claimants. In this matter, Total and Statoil seek a declaration that no overriding royalties are due Kerr-McGee and the Individual Claimants before the Lease produces 87.5 million barrels of oil equivalent. Total further seeks a credit and offset relating to the payments not due the Individual Claimants.[7]

Because the overriding royalties at issue involve rights to

---

[7] As of October 19, 2010, Total has also deposited into the Registry of the Court a total of over $22 million to cover, in its estimation, the production proceeds that Total would have owed Kerr-McGee and the individual Claimants for their overriding royalties if the DWRRA did not apply.

Chevron, which owns a 58% working interest in the subject Lease and is responsible for paying 33% of the overriding royalties due Kerr-McGee and the individual Claimants. Chevron has paid the overrides from the date of first production ans continues to do so.

Chevron estimates that 400-500 million barrels of oil equivalent are recoverable from the subject deep producing field, called the Tahiti Field. (Total's Ex. 17). For illustrative purposes, the Override Owners use a $70/barrel oil price, and Total calculates that (after subtracting the 87.5 million barrels) the Override Owners will receive well over a half a billion dollars form Total and the other lessees based on Chevron's prediction of 400-500 million barrels of oil equivalent. (Total's Reply, Doc. No. 171, at p. 8 & fn. 10).

minerals from a federal lease located on the OCS, the court has jurisdiction under OCSLA.  OCSLA, 43 U.S.C. §1349(b)(1).  Under OCSLA, the substantive law of the adjacent state (here, Louisiana) applies as surrogate federal law to the extent not inconsistent with other federal laws and regulations.  OCSLA, 43 U.S.C. §1333(a)(1), (2)(A).

In their respective motions, Total and Statoil argue that the two assignments at issue here (particularly, the Calculate and Pay provisions set forth above) unambiguously provide that the overriding royalties shall be calculated in the same manner and subject to the same terms and conditions as the landowner's royalty under the Lease.  And, thus Total and Statoil argue that they do not owe payments on the overriding royalties until royalty payments are due the federal government under the DWRRA, §304 (i.e., after production of the first 87.5 million barrels of oil equivalent).

On the other hand, Kerr-McGee and the Individual Claimants (collectively, the Override Owners) argue that the overriding royalties owing to them are separate and distinct from the royalty which are owed to the federal government and subject to suspension under the DWRAA.  The Override Owners reason that the "granting clause" in each assignment provides for payment of the overriding royalties from the first production, and the "Calculate and Pay Clause" in each assignment "is wholly consistent with the '100% of

production' meaning of the grant." (Kerr-McGee's Opp., Doc. No. 148, p. 21 of 30). They point out that the subject assignments do not expressly provide for abatement of the 4% override, and they argue that the subject Calculate and Pay clauses are either "terms of art" or ambiguous, and extrinsic evidence should be considered to interpret them or determine intent.

### *Term of Art? "No."*

Louisiana Civil Code Article 2047 provides:

> The words of a contract must be given their generally prevailing meaning.
>
> Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

La. Civ. Code Art. 2047.

Here, the court rejects the Override Owners' argument that this court find that the subject "Calculate and Pay" provisions are terms of art, because there is no one word or group of words in the subject "Calculate and Pay" provisions that is subject to a technical meaning. Thus, the court need not consider extrinsic evidence to give the words of these provisions their generally prevailing meaning.

### *Ambiguous? "No".*

Under Louisiana law, whether a contract is ambiguous is a question of law. *CLK Co., LLC v. CXY Energy, Inc.*, 972 So.2d 1280,

1286 (La. App. 3rd Cir. 2007); *Amoco Prod. Co. v. Texas Meridian Resources Exploration Inc.*, 180 F.3d 664, 668 (5th Cir. 1999). Further, under Louisiana jurisprudence,

> A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when language used in the contract is uncertain or is fairly susceptible to more than one interpretation. These rules are applicable even to contracts involving rights in immovable property, such as mineral rights.

*CLK*, 972 So. 2d at 1288, *quoting Blanchard v. Pan-OK Prod. Co., Inc.*, 755 So.2d 376, 381 (La. App.2d Cir. 2000).

Here, it is undisputed that the DWRRA applies to the subject Lease, and thus, the federal government's royalty is suspended during production of the first 87.5 million barrels of oil equivalent. Now, having examined the four corners of the subject Assignments and interpreting each provision "in light of the other provisions so that each is given the meaning suggested by the contract as a whole" (La. Civil Code Art. 2050), the court finds that the subject "Calculate and Pay" clauses are not ambiguous because they clearly provide that the overriding royalties "shall be calculated and paid in the same manner and subject to the same terms and conditions as the landowner's [federal government's] royalty under the Lease." Thus, Total's and Statoil's payments of the overriding royalty interest payments are suspended until

production reaches the 87.5 million barrels of oil equivalent.[8]

In so ruling, the court rejects the Override Owners' attempt to use parol evidence in an attempt to show intent. "When words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Art. 2046. Here, there are no absurd consequences of tying the overriding royalty owners' payments to those of the federal government as landowner, and treating the overriding royalty owner no better or worse than the federal government. The DWRRA was enacted several years before either assignment here was executed, and the original parties to the assignments were charged with the knowledge of that law before the assignments were executed. La. Civ. Code Art. 5 ("no one may avail himself of ignorance of the law"); *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)("[i]t is well established that persons owning property within a State [or in the OCS] are charged with knowledge of relevant statutory provisions affecting the control and disposition of property"). If the original parties to the assignments had intended to provide for payment of the overriding royalties on the first 87.5 million barrels when federal royalties

---

[8] The granting clauses contained in the assignments are not negated by imposing royalty suspension on the overrides. Rather, these granting clauses are superseded until the threshold 87.5 million barrels of oil equivalent is met, just as section 6(a) of the Lease which requires that the lessee "pay a fixed royalty ... in amount or value of production saved, removed or sold from the leased area," is superseded until the threshold 87.5 million barrels of oil equivalent is met under the DWRRA.

on the same production was suspended by the DWRRA, they were obligated to "expressly state their intent in [their] agreement." *Kenner Indus., Inc. v. Sewell Plastics, Inc.*, 451 So.2d 557, 560 (La. 1984).

### *Reformation? "No".*

The court also rejects the Override Owners' request for reformation as an attempt "to make an end-run around the parol-evidence rule by framing its argument as a request for reformation." *American Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 288 (5th Cir. 2009). The court has found that the "Calculate and Pay" clauses of the subject assignments are unambiguous, and parole evidence is not admissible to create ambiguity. Further, Total and Statoil are entitled to rely on the integrity of the assignments which were originally executed by sophisticated parties in the oil and gas industry years before Total and Statoil acquired interests in the Lease, and thus Total and Statoil should not now be prejudiced by reformation. *Id*. at 287.

### *Recoupment of Payments*

"A person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it." La. Civ. Code Art. 2299; *see also* La. Civ. Code Art. 2300-01. Here, Total is entitled to a refund of the overriding royalty

payments that it paid to six of the Individual Claimants. However, Total submits that:

> Total is willing to accept a lesser remedy from these six individual Defendants: instead of an immediate refund with interest, Total merely seeks an order of specific performance for Total to credit and offset the amounts of those prior checks against any future amounts that Total may owe to these same Defendants after the Lease has produced 87.5 million barrels of oil equivalent.

(Total's Memo., Doc. No. 76-3 at p. 19). The court will so order.

Accordingly;

**IT IS ORDERED** that Total's **Motion for Summary Judgment** (Doc. No. 76) and Statoil's **Motion for Summary Judgment** (Doc. No. 139) be and are hereby granted.

New Orleans, Louisiana, this **14th** day of **December**, **2010**.

                                            A.J. McNAMARA
                                   UNITED STATES DISTRICT JUDGE